**COMMONWEALTH OF MASSACHUSETTS**
**DIVISION OF ADMINISTRATIVE LAW APPEALS**
**BUREAU OF SPECIAL EDUCATION APPEALS**

In re:   Gregory[1]                                                    BSEA #1806094

## <u>DECISION</u>

This decision is issued pursuant to the Individuals with Disabilities Education Act (20 USC 1400 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 USC 794), the state special education law (MGL c. 71B), the state Administrative Procedure Act (MGL c. 30A), and the regulations promulgated under these statutes.

A hearing was held on March 15, 19, 23, 27, and 29 and April 3, 2018 before Hearing Officer Amy Reichbach. Those present for all or part of the proceedings were:

| | |
|---|---|
| Parent | |
| Student | |
| Ashley Bouley | Special Education Administrator (Grades 4-12), Freetown-Lakeville Regional School District (FLRSD) |
| Danielle Cote | Student's Private Mental Health Counselor |
| Nicole M. DeTerra | Special Education Teacher, Apponequet Regional High School (ARHS) |
| John C. Dorn | Neuropsychologist |
| Stephanie Ghannam | Tutor |
| Jack Higgins | Assistant Principal, ARHS |
| Aimee Lombard | School Adjustment Counselor, ARHS |
| Jessica Motta | Teacher, ARHS |
| Barbara Starkie | Principal, ARHS |
| Daniel Vanderlip | Education Supervisor, F.L. Chamberlain International School |
| Thomas A. Vautrinot | Psychologist |
| Ellen Witter-Harrington | Director of Student Services, FLRSD |
| Kelly Gonzalez, Esq. | Attorney for FLRSD |
| Michael Turner, Esq. | Attorney for Parent |
| Anne Bohan | Court Reporter |
| Jane Williamson | Court Reporter |

The official record of the hearing consists of documents submitted by the District and marked as Exhibits S-1 to S-70,[2] six days of recorded oral testimony and argument, and a six volume transcript produced by court reporters. At the request of the parties the case was

---

[1] "Gregory" is a pseudonym chosen by the Hearing Officer to protect the privacy of the Student in documents available to the public.
[2] Parent submitted no exhibits.

continued to April 10, 2018 and the record held open for submission of closing arguments. Closing arguments were received and the record closed on that date.

## INTRODUCTION

This matter began with the filing of an expedited *Hearing Request* by Freetown-Lakeville Regional School District (FLRSD or "District") against Gregory on January 22, 2018, accompanied by a *Request for Interim Relief from Stay-Put*. The District requested an order placing Gregory in a therapeutic day setting as well as an interim order relieving FLRSD of its obligation to return Gregory to his previous placement in a partial inclusion program at Apponequet Regional High School (ARHS). In support of its position, FLRSD argued that Gregory's behavior had escalated during the current school year; that he was presenting with aggressive and volatile behavior, delusions, and depression; that he had completed several evaluations, including an extended evaluation at the F.L. Chamberlain School ("Chamberlain") from late October 2017 to January 2018; and that Parent had rejected the District's proposal to place Gregory in a therapeutic day school and instead expressed his desire that Gregory return to ARHS. The District asserted that due to Gregory's "recent conduct," including a suicide threat, an attack on a fellow student, and a threatening phone call to the District administration, "the health or safety of the student or others would be endangered by delay."

In support of its request for interim relief from stay-put, the District acknowledged that Gregory's stay-put placement was the partial inclusion program at the high school, but argued that this placement was unable to "provide sufficient therapeutic and psychological services to address Student's emotional/mental health needs, as evidenced by his escalating violent and delusional behavior [and that this placement] appears to be a significant trigger for his behaviors." In essence, the District argued that returning Gregory to his stay-put placement would "likely be detrimental to him and, in turn, cause a significant risk to others." FLRSD requested leave to place Gregory at Chamberlain pending resolution of the instant appeal.

During a Conference Call on the matter that took place on January 24, 2018, it became clear that the District had communicated to Gregory, through Parent, that he could not return to ARHS upon his discharge from Chamberlain. At this point, Gregory had missed four (4) consecutive days of school. The undersigned Hearing Officer noted that Gregory in fact had the right to return to ARHS and denied the District's *Request for Interim Relief from Stay-Put*.

For the reasons below, I find that FLRSD's proposed placement of Gregory at a therapeutic day school is appropriate and the least restrictive environment for him. Its proposed IEP for the period from January 18, 2018 to January 17, 2019 is not fully developed, however, and as such I cannot find that it provides him with a Free Appropriate Public Education (FAPE). The District is hereby directed to locate an appropriate therapeutic day school for Gregory and work with that placement to modify its proposed IEP such that it contains sufficient detail, including a transition plan.

# FINDINGS OF FACT

## Gregory's Early History

1. Gregory is a sixteen year-old resident of Lakeville. He lives with his father and paternal grandparents. (S-1; Father VI: 101)[3] His goals are to "have a better life," join the military when he turns eighteen (18), and be a politician. (Student VI: 29) Gregory has been described as a "good kid," (DeTerra III: 42) "a great kid" with a "big heart," (Ghannam II: 187) and a kid with a "great sense of humor" who is "creative" and "very enjoyable to be around when he's happy." (Lombard IV: 33) His father works hard, both generally and to be the best parent he can be. (Vautrinot I: 239, 255, 259)

2. FLRSD is a regional school district serving the towns of Freetown and Lakeville. The district is comprised of five (5) schools, including Freetown-Lakeville Middle Schools, which serves students in grades six, seven and eight, and Apponequet Regional High School (ARHS). (Higgins II: 198; Starkie IV: 156)

3. Gregory transferred to FLRSD in the middle of seventh grade from Andover Public Schools, where his IEP included placement in a substantially separate classroom, community-based instruction, extended school year services, and specialized transportation. Prior to moving to Lakeville, Gregory resided with his mother. His history of trauma includes a relative threatening, and possibly attempting, to kill him; exposure to gun violence and sexual assault; and his mother's attempt to have him hospitalized involuntarily. (S-8, S-21, S-22; Vautrinot I: 195-96, 217-18; Ghannam II: 138-41, 165-66, 169; Starkie IV: 248-50; Cote V: 10-11; Student VI: 51, 66; Father VI: 103, 153-56) According to Gregory, his early life was full of "negative things," such as people lying to, hating, and using him. (Student VI: 7, 16, 48, 67) To date, FLRSD has not been informed of the full extent of Gregory's traumatic experiences. (Vautrinot I: 195-96, 198; Starkie IV: 250; Cote V: 114, 121-22; Harrington V: 234, 243; Student VI: 7; Father VI: 152-56, 294-95)

4. Gregory has been seeing licensed mental health counselor (LMHC) Danielle Cote for ongoing outpatient therapy since June of 2015. Ms. Cote has a bachelor's degree in general psychology and a master's degree in mental health counseling. She operates a private practice where ninety percent (90%) of her clients have anxiety disorders, including Post Traumatic Stress Disorder (PTSD), mood disorders, and developmental disorders. She has worked with people on the autism spectrum throughout her career in various capacities. (Cote V: 6-8). Ms. Cote meets with Gregory every other week and has diagnosed him with PTSD and depression.[4] (Cote V: 9, 57) She works with him on confidence and self-esteem, employing cognitive behavioral therapy and teaching him to use meditation and prayer. (Dorn I: 44; Lombard IV: 21, 34; Cote V: 61, 109; Harrington V: 178; Student VI: 8, 41) Ms. Cote has also referred Gregory to a psychiatrist for depression, though she is aware he is not seeing one. (Cote V: 68-70) Ms. Cote is in regular communication with Aimee Lombard, the ARHS adjustment counselor who works with Gregory. Ms. Lombard believes that Ms. Cote is not as concerned about Gregory's mental health as she herself is. (Lombard IV: 17, 22;

---

[3] References to testimony are by witness name, transcript volume, and page(s).

[4] Gregory's father reported a previous autism spectrum diagnosis to Ms. Cote as well, which she has accepted though she has seen no documentation of the diagnosis. (Cote V: 7-8, 56-57, 134) See paragraph 5, *infra*.

Cote V: 16-17) Ms. Cote has never observed Gregory in an academic or social setting. (Starkie IV: 220-21; Cote V: 47, 51, 58, 96)

5. During his time in FLRSD, Gregory has always received special education. He has been diagnosed with Intellectual Developmental Disorder-mild, Unspecified Neurodevelopmental Disorder, and a moderate language disability. (S-1; S-21; S-5) Although Gregory's father and therapist referred to a previous diagnosis of autism spectrum disorder (ASD), neither was able to produce any documentation of this diagnosis, and Ms. Cote could recall neither its origin nor having seen any paperwork to support Parent's report.[5] (Cote V: 7-8, 56-57, 134; Father VI: 104-06) Ms. Lombard does not believe Gregory displays symptoms of autism, and more recent testing indicated that Gregory does not support a diagnosis of ASD. (S-22; Lombard IV: 24)

6. Following Gregory's enrollment in FLRSD, specifically at Freetown-Lakeville Middle School, the District adopted his IEP from Andover and developed an IEP dated December 12, 2014 to December 11, 2015, placing Gregory in a substantially separate classroom with small group speech and language instruction, 1:1 counseling, and specialized transportation, among other things. (S-7, S-8; Harrington V: 224-25; Parent VI 107)

7. Parent accepted this IEP in full. In the "Parent Comment" section of the IEP, he requested that the District increase Gregory's inclusion opportunities as much as possible. Parent subsequently requested that Gregory be transported on the regular school bus. The District agreed to this change and proposed an amendment to remove specialized transportation and include a bus safety plan. Parent accepted this amendment. (S-6, S-7)

8. Gregory's last accepted IEP, dated December 8, 2015 to December 8, 2016 ("2015-2016 IEP"), covered his eighth grade year, extended school year services, and the first three months of his ninth grade year. This IEP placed Gregory in a partial inclusion program for ninth grade, consistent with Parent's request for a less restrictive program. (S-5; Harrington V: 224-26)

9. On or about April 12, 2016, Parent requested that the District complete its three-year re-evaluation of Gregory early in order to obtain additional information in advance of his transition to high school. (S-67; Bouley III: 144-45; Parent VI: 109-10, 214-18) The District sent home a consent form for these evaluations, which Parent signed on or about May 31, 2016 and the District received June 6, 2016. Because it was so close to the end of the school year, evaluations began shortly thereafter but continued into the fall. (S-27, S-28, S-29; Bouley III: 145-46 (evaluations had to be completed by September 27, 2016 and the Team meeting had to occur by October 19, 2016); Parent VI: 218-19)

---

[5] At hearing, Parent referred to an evaluation from Children's Hospital, Children's Floating Hospital or North Shore Medical Center Children's Hospital, conducted in July 2014, that diagnosed Gregory with autism spectrum disorder (ASD) (Father VI: 104-06, 230), but no one at hearing had seen any evaluation to this effect.

**Gregory's First Year at Apponequet Regional High School**

10. ARHS serves approximately seven hundred eighty (780) students, including students in grades nine (9) through twelve (12) and special education students through the age of twenty-two (22). Two levels of general education courses are offered at the high school: college prep ("CP") and honors, the latter including Advanced Placement for older students. (Higgins II: 198-99, 210-12; Starkie IV: 156)

11. ARHS has a number of special education programs in-district, ranging from full inclusion classrooms to substantially separate programs. The inclusion classrooms serve students with mild-to-moderate special education needs who are able to access grade level curriculum with supports. The substantially separate Life Skills program provides functional academic and daily living skills support for students with IQs of seventy (70) or below with significant cognitive impairments and/or cognitive impairments paired with physical disabilities. The District also has an online virtual school program offered to both general and special education students, and a program for students with high cognition and social-emotional disabilities who are independent learners. (Higgins II: 212; Bouley III: 142-43; Lombard IV: 62; Starkie IV: 157-164, 222; Harrington V: 149-50)

12. Gregory has been educated in ARHS's partial inclusion program since he entered high school. Called the Personalized Learning Program ("PLP"), this program serves students with lower cognitive abilities who require significant modifications to access grade-level curriculum. The PLP is a heavily supported diploma-track program aimed at providing students the supports they need to pass the Massachusetts Comprehensive Assessment System (MCAS) either by attaining a passing score on the examination or by submitting a sufficient competency portfolio to the state. Students in the PLP attend small (seven to ten students) classes co-taught by a content area teacher and a special education teacher and supported by a paraprofessional for English Language Arts (ELA) and/or Math, depending on their needs. The content teacher is responsible for ensuring that the curriculum is aligned with the Massachusetts Curriculum Frameworks; the special education teacher ensures that the curriculum is modified and students are accommodated in accordance with their IEPs. For example, in PLP ELA students use texts modified to their levels of reading, writing, and comprehension, and they are given additional time to produce written work. Students may also be given multiple opportunities to improve their grades through re-teaching and reassessment. Modifications may be made to the classroom environment as well, including the allowance of breaks to walk around and/or use hand-held devices where appropriate. PLP students take CP science and social studies, co-supported by paraprofessionals, with additional modifications and supports as needed. PLP students, including Gregory, are also enrolled in an academic support class with a special education teacher. In academic support, students receive assistance in completing their work for both PLP and non-PLP classes. (S-5; Motta II: 8-12; Higgins II: 211-13; DeTerra III: 9, 11-14, 21-22, 121; Bouley III: 142-43; Starkie IV: 158-60, 174; Harrington V: 149-50)

13. During his time at ARHS, Gregory participated in the PLP as described above for ELA and Math. He had significant support and modifications in his general education courses, and he frequently worked on History and Science during his academic support period. He had

difficulty admitting when he did not know something and tended not ask for help, but often required someone sitting next to him in order to keep him on task. (Motta II: 15; DeTerra III: 14-15, 18, 20-22, 120-24; Student VI: 76) Pursuant to his 2015-16 IEP, Gregory received both 1:1 counseling and small group counseling with adjustment counselor Aimee Lombard. (Ex. 5; Lombard IV: 10)

14. Shortly after Gregory began attending ARHS, his teachers began expressing concern about his ability to access the curriculum and their ability to assess what he had learned, since he was demonstrating difficulty completing assignments properly, appeared hesitant to receive help at times, and often went off-topic on political subjects, such as President Trump and building a wall. Moreover he appeared particularly agitated in his interactions with other students. (Motta II: 13, 17-18, 34-35, 39-40; Higgins II: 207, 209, III: 182; Bouley III: 165-66; Lombard IV: 12-14; Starkie IV: 171-72) His ELA teacher, Jessica Motta, stated that she recognized how unique a student Gregory was, as she had "never seen a kid struggle so much to write a coherent sentence, thought, paragraph. . . who couldn't answer [her] without broken thought and interruptions in what he's saying or writing, with information that is totally irrelevant." (Motta II: 17) Ms. Motta further testified that she cannot assess Gregory's potential because "his thoughts interfere too much with how he communicates with [her], that [she] can't tell where his abilities begin or lie and where his disabilities begin because of his interruptive thinking, his speaking and disordered thinking." (Motta II: 84) Ms. Motta appeared to have deep-seated concern for Gregory, so much so that she began crying during her testimony about his level of distress in her classroom. (Motta II: 89)

15. Counselors and administrators discussed Gregory during bi-weekly student support meetings as well. His adjustment counselor Aimee Lombard expressed concern about his ability to assimilate to the school. (Higgins II: 202-03, 205; Lombard IV: 15)

16. Gregory, on the other hand, perceives himself as more capable than he actually is.[6] For example, he often claims to have read certain novels assigned to high school students at ARHS, and requests more challenging work as well as placement in honors and/or Advanced Placement classes, though he struggles to complete his current assignments with support and modifications. His tutor, certified teacher Stephanie Ghannam, described this as follows: he "tells me he can do all this; he's done it very well. But when I ask him to do what's in front of him [work being done in his current classes], he's unable to do it." (Ghannam II: 174; Motta II: 43-44; DeTerra III: 20-24, at 35-36; Ghannam at 108-110, 159-61, 174) Similarly, Gregory believes his non-academic abilities to be greater than they are; he thought he would be the star of the baseball team in ninth grade, but was removed from the team because he was having such a hard time paying attention and it became dangerous for him to be on the field. (Lombard IV: 123-24)

17. Gregory's father also perceives his academic functioning to be higher than it is. (Motta II: 49; Father VI: 108-09) He describes Gregory as having an intellectual or learning disability and PTSD, as well as autism, but not a thought disorder. (Father VI: 104-06) At hearing, Parent reported that he had seen Gregory do "wonderful work," including Advanced

---

[6] At hearing, Gregory talked about doing college prep ("CP") and honors work, said he was "learning some new educations by [himself]. And this is extremely rare, because not every student does this." (Student VI: 66)

Placement biology, on the computer and through virtual schooling. (Father VI: 104-05, 170, 233, 278-79, 281-82, 288, 296-97, 299)  He believes that when Gregory is doing geometry or history on the computer, "the disability disappears, and he excels," because he is making an effort in those subjects. (Father VI: 279)

18. Following the completion of Gregory's three-year re-evaluation, Gregory's Team met on October 20, 2016 to review the results and develop a new IEP. Parent was not able to attend this Team meeting and requested that Gregory's counselor, Danielle Cote, attend in his place.[7] At this meeting, the Team discussed a psychoeducational assessment of Gregory performed by school psychologist Carol Gromet, M.S. NCSP, and a speech and language evaluation performed by speech and language pathologist Stacey Brouillette.[8] Ms. Gromet reported a Full Scale Intellectual Quotient (FSIQ) of 70, with strengths in fluency in math and reading, though Gregory made many errors when he read and his comprehension in math problem-solving skills was below expectation. Ms. Brouillette's report noted difficulties with speech but did not recommend additional speech therapy. (S-27, S-28; Bouley III: 147-51; Dorn I:30) Ms. Cote reported that she had seen progress in Gregory's ability to communicate clearly. (Lombard IV: 18)

19. Rather than propose an IEP to replace the 2015-2016 IEP, which was due to expire in December 2016, after observing Gregory at the Team meeting and reviewing the data, the District proposed an evaluation at Regional Educational Diagnostic Service (READS), a local collaborative, to obtain neuropsychological and personality assessments of Gregory. Grades 4-12 Special Education Administrator Ashley Bouley called Parent following the meeting to discuss the District's proposal. The Team agreed to keep following the 2015-2016 IEP in the interim. (S-26; Bouley III: 154-56)

20. The District generated and sent Parent an N-1 form and a consent form following the Team meeting. Parent was reluctant to agree to any evaluation that might result in a more restrictive placement for Gregory, which he explained during his initial call with Ms. Bouley on October 20, 2016 and again when she called him in December. Parent ultimately signed the evaluation consent form on or about January 6, 2017 and the District received it on or about January 26, 2017. When he returned the form, Parent had checked "partial acceptance" and included a number of comments. Ms. Bouley sent a letter to Parent addressing his concerns, accompanied by a READS intake form. The District did not receive signed, fully accepted intake or consent forms during the 2016-17 school year. (S-26; Bouley III: 155-63; Parent VI: 110-111, 235-40)

21. Following the expiration of the 2015-16 IEP in December 2016, the District continued to educate Gregory under his stay-put IEP. (Bouley III: 156)  In his ninth grade year, Gregory

---

[7] The Team meeting was initially scheduled for October 14, 2016 but was postponed when Father opted to have Danielle Cote, Gregory's therapist, attend the meeting in his place; the District needed time to obtain written consent for this substitution. (Bouley III: 149-50)

[8] Parent believed that the evaluations were withheld from him by the District, though it appears that they were, in fact, shared with Ms. Cote at this meeting. (S-26; Bouley III 147-49l ; Father VI: 220-24, 241) At hearing, Parent testified that Ms. Bouley had told him that she would not authorize the independent evaluations he had requested without sending Gregory back to life skills and implied that the 2016 evaluations submitted into evidence by FLRSD may have been fabricated. (Father VI: 224, 238, 240)

earned Ds in PLP math, CP biology, and CP history. He received Cs in PLP ELA and Marketing, and a B- in Wellness. (S-18, 31; Lombard IV: 64; Starkie IV: 224) Gregory received "needs improvement," which is a passing score, on the Biology MCAS examination. (DeTerra III: 65; Bouley III: 166)

22. On May 26, 2017, Gregory expressed that he was very depressed and made a comment referring to suicide in front of a teacher, who reported the comment to ARHS administration. Administrators informed Parent, who said he would keep an eye on Gregory, and arranged for a school resource officer to make a visit to the house that day. (S-10; Higgins III: 183-84)

**Fall 2017**

23. Gregory's father and therapist, and Gregory himself, believed that if Gregory passed the Biology MCAS, he would be able to take general education classes. Gregory obtained a passing score, but was disappointed when his tenth grade placement continued to be the PLP. He had hoped to be perceived as "normal," and believed general education classes would help. Ms. Cote asked Ms. Lombard to consider changing Gregory's placement at school "to give him a shot at the regular classes," as she was "pretty confident that it was going to work out" given all of the progress she had seen in Gregory as he worked through his PTSD. Ms. Cote believed that the decrease in his stress would allow Gregory to "reach his full potential." (Cote V: 17, 19-20, 31; Father VI: 122-24)

24. From the beginning of his tenth grade year, Gregory's presentation continued to be tangential and scattered, but he seemed "darker, gloomier," more closed off and resistant to assistance from teachers, and less receptive to people around him at school. (S-10; Motta II: 14, 18-19, Lombard IV: 30-31, 34, 42-43; Harrington V: 237-38) His presentation and behavior deteriorated over the fall such that he was often swearing and unwilling to do work. He appeared to be angry that he was not in general education or honors classes. Moreover he was evincing distress, delusions, disorganized thoughts, and increased difficulties with peers. (S-25; Motta II 21-22, 79-80; Lombard: IV: 88, 96-97, 107) ARHS administrators became more concerned as the school year progressed. (Higgins III: 218-19; Starkie IV: 239-41; Harrington V: 237)

25. Academically, Gregory continued to require considerable assistance. He often required that someone sit with him in order to keep him focused. He was able to read, but he could not comprehend what he had read, and was therefore unable to "apply inferential questions that are typically asked in a high school-level class to produce an answer that would make sense or answer what the question is asking." (DeTerra 20-24; Motta II 21) His work product from this period demonstrates the difficulty he had staying on topic as well as his focus on politics, even when irrelevant to the assignment. (S-18; Motta II: 23-37)

26. On or about September 12, 2017, Gregory posted a picture and video of himself on the social media site Snapchat. In the picture, Gregory appears to have a rope around his neck, and in the video he reportedly made a statement to the effect that he should just kill himself if he has to remain in the PLP. The following day, Gregory's classmates reported the image to a

teacher, who reported it to Assistant Principal Jack Higgins. Both Mr. Higgins and Ms. Lombard met with Gregory, who stated that he was feeling depressed, upset, and angry because he had to be in PLP classes. Parent was called into a meeting that day with Mr. Higgins and FLRSD Director of Student Services Ellen Witter-Harrington (Mrs. Harrington), who expressed their concern for Gregory's safety and wellbeing. (S-10, 17; Higgins III: 190-95; Lombard IV: 35-36; Starkie IV: 176)

27. At hearing Parent and Ms. Cote described this image as Gregory with a rope under his chin, rather than a noose, and expressed that they were not very concerned about it. (Cote V: 17; Father VI: 128-130, 191-92) Parent believes the image submitted by the District as an exhibit has been altered as "character assassination" of Gregory. (Father VI: 129) Gregory also reported that the rope was around his chin, that he did not mean to kill himself, and that he posted the picture and video because he wanted freedom and wanted to tell the school that he "just want[s] to be in a regular class." (Student VI: 70; Cote V: 18)

28. During their meeting with Parent on September 13, 2018, Mr. Higgins and Ms. Harrington told Parent they believed Gregory would benefit from further testing to determine whether "some of the things that he's struggling with right now were things that maybe were as a result of some things going on inside." The following day, Parent returned the READS paperwork, which the District then supplemented with its own information and sent to READS. READS scheduled a neuropsychological and personality evaluation for September 26, 2018. (S-24-25; Higgins III: 195)

29. On or about September 18, 2018, during a meeting with Ms. Lombard and Mr. Higgins, Gregory mentioned that he had "egged" another student's car. He stated it was a prank, but also indicated that the other student "deserved" it. In discussing this incident, Gregory said, several times, "I am not going to kill anyone." (S-10, 16; Higgins III: 197-99, Lombard IV: 37-38) Mr. Higgins called Parent to report concerns for Gregory's safety and wellbeing. Upon learning that there were guns in the home, Mr. Higgins sent the school resource officer to the home to ensure that the guns were stored safely. (S-10; Higgins III: 200-01; Starkie IV: 183-84; Parent VI: 213)

30. Following this incident, Ms. Lombard met with Gregory daily. He continued to express a desire to be normal and appeared concerned that he might be sent to a therapeutic hospital or a "mental home," at the age of 18 (S-10; Lombard IV: 36-37, 96, 148; Harrington V: 145; Student VI: 85). Dr. Starkie, who was conducting an observation of Ms. Lombard during the course of her duties as a principal, observed one of Gregory's counseling sessions, with his permission. Gregory's presentation during this session concerned her, as she noted that he was "very tangential [and] made some concerning statements about wanting others to be punished or hurt and perhaps some indicators even about self-harm. . . It was very hard to follow the stream of conscious [sic] conversation . . . he appeared to be very dysregulated." Following this observation, Dr. Starkie called Dr. Dorn at READS to share her impressions with him. (Starkie IV: 179-183)

31. On September 26, 2017, Gregory began an evaluation at the READS Clinic. (S-22) The referral packet for READS included a teacher assessment completed by his ELA teacher,

Jessica Motta, which described his academic functioning as follows: "broken/interrupted thoughts, writing in incomplete sentences, communicating incomplete ideas . . . disconnected from reality, obsessive thoughts/conversations about 'the government, the CIA.'" Ms. Motta also noted that Gregory "views his peers in very exaggerated terms, and worries that they perceive him in the same way. His view of reality is often skewed and he misunderstands basic forms of communication." (S-25; Motta II: 46-47)

32. Clinical psychologist and neuropsychologist Dr. John Dorn[9] conducted a Diagnostic Neuropsychological Evaluation of Gregory on September 26, 2017. Dr. Dorn reported that Gregory has a FSIQ of 71and diagnosed him with a mild intellectual development disorder. Dr. Dorn noted that Gregory may "present a little bit higher than his intellectual scores would indicate [though] underneath it, the intellectual limitations are substantial. And his actual functioning generally ranges between the mid-third to probably eighth grade level, maximally." (S-22; Dorn I :29, 34)

33. In addition to diagnosing Gregory with "Intellectual Developmental Disorder, mild," Dr. Dorn diagnosed him with "Unspecified Neurodevelopmental Disorder," reflecting his "generalized cognitive weaknesses and delays in development over the years." Dr. Dorn considered whether Gregory had ASD, but did not believe "he has a primary autism spectrum disorder." Furthermore, Dr. Dorn noted concerns about possible bipolar disorder, schizophrenia, or schizoaffective disorder and recommended follow-up assessment by his colleague, Dr. Thomas Vautrinot, because Gregory's behavior during his assessment (rambling, losing track of his thoughts, expressing delusions, distracted by internal thoughts with some obsessive perseverative tendencies – including repeated references to his political ideas) led Dr. Dorn to be concerned about his mental health. (S-22; Dorn I: 22, 27, 32-33, 38-40, 41-42, 48; Vautrinot I: 185) Dr. Dorn also called Dr. Starkie at ARHS to share his concerns about Gregory's ability to succeed in his current academic environment. (S-10; Starkie IV: 185-86)

34. Dr. Vautrinot conducted a Diagnostic Personality Evaluation (including a risk and personality assessment) of Gregory on October 10, 2017.[10] (S-21; Vautrinot I: 182) Dr. Vautrinot interviewed Gregory and his father and administered a variety of tools in the course of his assessment; he also reviewed previous evaluations, teacher questionnaires, Gregory's IEP, and a Developmental History Questionnaire that had been filled out by

---

[9] Dr. John Dorn is the chief psychologist at Regional Educational Diagnostic Service (READS) in Middleborough, the chief neuropsychologist and medical director of neuropsychology at Southcoast Health Brain & Spine Center, and the director of testing at South Shore Mental Health, Bayview Associates in Plymouth. He evaluates approximately six to ten students per week and is qualified to make diagnoses related to psychiatric functioning, depression, anxiety disorders, adjustment disorders, neurological disorders, Attention Deficit Disorder, autism, and learning disabilities, among other things. (Dorn I: 21-22)

[10] Dr. Thomas Vautrinot is a psychologist who works at READS Collaborative, Bayview Associates, and in private practice. He has a doctorate in clinical psychology from Massachusetts School of Professional Psychology and has been licensed since 2006. At READS, Dr. Vautrinot conducts risk assessments, personality assessments, and psychological assessments. At Bayview Associates, he works as a supervising psychologist, training postdoctoral psychologists in testing and/or therapy. In private practice, Dr. Vautrinot does clinical work and testing. In total, he conducts four to five evaluations per week and spends approximately fifty (50) hours per week providing direct care through evaluations and therapy. Dr. Vautrinot is qualified to diagnose anxiety, mood, thought, eating, and adjustment disorders as well as autism. He is not qualified to prescribe medication. (Vautrinot I: 179-81, 183)

Parent. (Vautrinot I: 192-93) Gregory refused to complete the Suicidal Identification Questionnaire as it was "too overwhelming, and he was very scared" by it, possibly because he was afraid of being hospitalized if he revealed too much information. He mentioned having hallucinations, but did not want to talk about them. (Vautrinot I: 190, 214-15) Dr. Vautrinot also spoke with Ms. Cote, who noted that Gregory was getting more disorganized than he had been previously and agreed that psychiatry should be pursued, but expressed concern that if Gregory were to be referred to a 45-day placement he would view it as a blow to his ego and his depression would intensify. (Vautrinot I: 201-22) Dr. Vautrinot concluded that Ms. Cote "wasn't too dialed in on [Gregory's] psychosis" and he hoped, given her longstanding relationship – and the trust she had built – with the family, that his report "would clue her in, so that she could go after that later." (Vautrinot I: 245-46) Ms. Cote believes that what Dr. Vautrinot characterized as delusions are actually simply coping mechanisms arising from Gregory's traumatic experiences, and that Dr. Vautrinot did not understand this because he did not see the "full picture." (Cote V: 34-37, 127)

35. Dr. Vautrinot observed that Gregory was mildly depressed, mildly anxious and "signaling a lot of distress," as evidenced by "the way he spoke and . . . the different high levels of disorganization and tangential thinking and flight of ideas that he had," which seemed "almost stream of consciousness thinking and discourse that really was not very connected to anything actually emotional that he was experiencing or anything like that." (Vautrinot I: 191, 206, 221) Dr. Vautrinot concluded that Gregory was "in pretty substantial disarray psychologically," that there was "lots of distortion" in the way he interacted with the outside world, and that he had "delusional beliefs."[11] He was vocalizing suicidality about being "singled out" by being in the PLP. Still, Dr. Vautrinot concluded that Gregory was at no current risk for suicidal or homicidal behavior. He did, however, find that Gregory was at moderate current risk for further impulsive and unfiltered behavior. (S-21; Vautrinot I: 204-06, 220, 235, 243-44)

36. Dr. Vautrinot's report did not include any diagnoses, but noted that Gregory "appears to be experiencing a psychotic episode featuring delusional material and problems with disorganized speech and thinking." Dr. Vautrinot concluded that Gregory's presentation was likely due to mood-related psychosis, the emergence of schizophrenia, or substance abuse (a possibility unsupported by any evidence at hearing, and which Dr. Vautrinot also found unlikely). (S-21; Vautrinot I: 206, 221-22, 247-48) He recommended that Gregory attend a 45-day placement or partial hospital program where he could receive psychiatric services within a structured environment. He believed that Gregory, in his then-current state, would be unable to access and respond to the curriculum at ARHS effectively. Dr. Vautrinot thought it possible that Gregory was experiencing post-traumatic stress disorder, but opined that he needed to be psychiatrically clear and stable (possibly with the assistance of proper medication) in order for a determination to be made regarding the impact of his trauma and how best to address it. (Vautrinot I: 202-03, 222-23, 237, 249)

---

[11] For example, Gregory appeared fixated on helping French exchange students visiting the school that day, stating (completely off topic) that he could interpret for them because he spoke French fluently. He also told Dr. Vautrinot that he had figured out a new emotion inside him called "nor," which occurs when you don't know what's going on but want to test the other person. He stated that he was kind of famous and the thought people would kill him. (Vautrinot I: 209-11)

37. Before a meeting could be convened to discuss the READS evaluations, an event occurred at school that further elevated administrators' concerns regarding Gregory's wellbeing. On October 6, 2017, Gregory got into a fight with another student on the school bus while it was parked in front of the high school. The other student made a comment to Gregory, associating his bandana with gang membership. Gregory threw the first punch. After the other student held him at a distance to try to end the fight, Gregory punched him again, after which the other student punched Gregory back. Following a hearing, Gregory received a five (5)-day suspension. (S-10, S-15; Higgins III: 203-13; Lombard IV: 42-44; Starkie IV: 188)

38. Asked about this incident at hearing, Gregory explained that he was "being a hero," "helping out other people," and "helping disability people." (Student VI; 23, 24, 65)

39. By this point, ARHS administrators were concerned with what they saw as escalating behavior on the part of Gregory. (Higgins III: 218-19) Although Gregory should have returned to school from his suspension on October 18, 2017, after speaking with Dr. Vautrinot, Dr. Starkie determined it would be better not to have Gregory return to school until his Team reviewed the READS evaluations. She called Parent, and it is unclear whether Parent agreed to keep Gregory home from school on October 18 and 19, 2017 or was told he could not send Gregory to school for these two days.[12] (*Compare* Starkie IV: 190-92 with Father IV: 127, 156-57) A school resource officer dropped off Gregory's school work at his house, and it appears that he was given excused absences for these two days. (S-10, 58, 61; Higgins III: 220; Starkie IV: 190-92)

40. On October 20, 2017, a meeting was convened to discuss the evaluations conducted by Dr. Dorn and Dr. Vautrinot. In attendance at the meeting were Dr. Vautrinot, Parent, Ms. Harrington, and Dr. Starkie. Given its composition, notably the absence of a teacher or, in fact, anyone who worked directly with Gregory at school, this was not a Team meeting. Dr. Vautrinot discussed his report and his concern that Gregory was experiencing mood-related psychoses, depression, and possibly the emergence of schizophrenia, symptoms that merited intensive intervention. He believed it was important that Gregory have access to psychiatric services and a medication referral. At this time, the attendees at the meeting proposed a forty-five (45)-day placement where Gregory could receive psychiatric care and antipsychotic medication, if appropriate. The group considered the Baird Center – Home for Little Wanderers, South Shore Collaborative, and F.L. Chamberlain International School. Gregory appeared to recognize that he was very disorganized and wanted help. He expressed interest in Chamberlain and was willing to consider medication. Although he was uncomfortable regarding some of the reported information about Gregory's childhood, and somewhat suspicious of a therapeutic placement, Parent indicated that he would agree to an extended evaluation at Chamberlain. (S-45; S-58; Starkie IV: 194-97; Vautrinot I: 246-47 at 256-59, 259, 268; Higgins III: 220-21; Harrington IV: 310-13; Parent VI: 131, 131-32)

41. Following the meeting, the District proposed an IEP for Gregory to attend Chamberlain. Parent partially accepted this IEP on October 27, 2017, rejecting it insofar as it might extend

---

[12] Parent testified at hearing that Dr. Starkie called him and told him that even though Gregory's suspension ended and he was supposed to return to school on October 18, 2018, Gregory was not to be on school grounds. According to Parent, he was not given any other option. (Father VI: 127)

beyond the forty-five (45)-day period. (S-3; Parent VI: 208) He also signed an Agreement for Placement and Services Rendered for Chamberlain on October 26, 2017 for an October 30, 2017 start date. (S-20)

42. Gregory did not attend school between the end of his suspension on October 17, 2017 and his first day at Chamberlain on October 30, 2017. Dr. Starkie contacted Parent on October 20, 2017 to discuss keeping Gregory home until a placement decision was made. Once again, it is unclear whether Parent agreed to do so or was told he had no option.[13] Through internal documentation dated October 20, 2017 the District expressed an intention to arrange for five (5) hours a week of tutoring, but no evidence was offered as to whether that tutoring occurred prior to the start of Gregory's extended evaluation at Chamberlain. According to Parent, Gregory attended "virtual school" during this time, but it appears that he may have simply been completing work on his own through Google classroom, without any instruction. (S-10; Father VI: 127, 156-58, 181-83)

43. At no time during the fall of 2017 was a Team meeting convened. (DeTerra III: 94; Harrington V: 228)

**Gregory at Chamberlain**

44. F.L. Chamberlain International School is a special education school approved by the Massachusetts Department of Elementary and Secondary Education. It serves approximately eighty (80) students from eighth grade to age twenty-two (22). Chamberlain offers three different academic programs: an academically advanced college preparation program, a general education ("general studies") program, and a life skills program. All three programs have a 4:1 student-to-staff ratio. The general studies program follows the Massachusetts Curriculum Frameworks with some flexibility in pace and the ability to focus on specific gaps in students' knowledge and skills. (Vanderlip I: 89-90, 127, 139, 162)

45. Gregory attended Chamberlain as a day student in the general studies program from October 30, 2017 to January 18, 2018. The purpose of the diagnostic placement was to identify his needs, develop a plan to meet those needs, and explore medication as a way to address Gregory's disorganized thought patterns. (S-3; S-19; Vanderlip I: 90, 93, 96, 127; Harrington IV: 322)

46. Gregory's attendance and behavior at Chamberlain were good. He complied with routines, and though he kept to himself in class he would participate in discussions. Gregory completed grade-level work with accommodations and modifications, showing himself to be academically capable in this setting. He struggled when he would veer off from the subject, particularly when he believed something to be different from what an assignment would state. He benefited from the small, structured classroom setting, established goals and expectations, and various individualized supports including visual prompts and hands-on

---

[13] Parent testified that Dr. Starkie told him that he could not bring Gregory back to school after his suspension ended because Dr. Vautrinot had told her that Gregory was a danger to himself and others. According to Parent, Dr. Starkie told him at this time that Gregory was not permitted on school property and that the Team would probably be looking at an out-of-district therapeutic placement. (Parent VI: 127, 156-57, 295)

activities. Gregory did not develop very strong bonds with other students, though he did interact with them socially. Sometimes other students reported "some kind of erratic things that [Gregory] would say." At Chamberlain, Gregory responded relatively well to redirection in the classroom, but he did not respond as well to "more clear, blatant support" such as therapy. (S-19; Vanderlip I: 93, 101-03, 112-13, 129, 139, 162, 168)

47. Gregory did not participate in after-school activities while at Chamberlain, though as a day student he had access to dances and a basketball league. (Vanderlip I: 153, 174) He also had continued access to ARHS events, including homecoming, although he did not attend any. (Starkie IV: 198-99, 212)

48. In addition to academic supports, Gregory received therapeutic and clinical supports at Chamberlain, including weekly individual therapy (45 minutes) and classroom-based group therapy once a week focused on social dynamics. (S-19; Vanderlip I: 98, 109-10)

49. Gregory had access to a psychiatrist, Dr. John Kersting, at Chamberlain. They met four times between November and December but then Gregory discontinued their sessions by refusing additional meetings. (S-19; Vanderlip I: 98, 109, 117)

50. Gregory's therapist at Chamberlain, Alan Edmond, and Dr. Kersting proposed a trial of an antipsychotic medication for Gregory. (Vanderlip I: 97-98) At hearing, Gregory testified that this was harassment, that Dr. Kersting "forced me and threatened me [because] he thinks I was mental." (Student VI: 69)

51. During his time at Chamberlain Gregory did not receive antipsychotic medications. (Starkie IV: 215-16) He was concerned about it brainwashing him or possibly being a poison. (Vanderlip I: 97)

52. While at Chamberlain, Gregory demanded to be placed in Advanced Placement and honors level courses. Chamberlain determined that placement in these classes would not be appropriate given the gaps and struggles he had with concepts such as exponents in math and the Bs and Cs he was earning in general courses. Ultimately, one of his teachers provided him with two honors-level books in response to his continued requests, which he carried around but did not take out of his bag. (S-19; Vanderlip I:103-04, 124-27; Harrington V: 139-40) While at Chamberlain, he also requested that he be sent more challenging work from ARHS. (Starkie IV: 199-201; Harrington V: 142-43)

53. When Gregory became frustrated at Chamberlain, he would sometimes approach education supervisor Dan Vanderlip to request honors level textbooks; discuss how he felt about being there; and explain that he was reporting something that was bothering him to people at ARHS, news agencies, politicians, and the Department of Education. (Vanderlip I: 91) This kind of behavior led Chamberlain staff to describe Gregory as "grandiose, paranoid and with loose and disorganized thought pattern." (S-19; Vanderlip I: 121-22)

54. On November 20, 2017, while attending Chamberlain, Gregory left a voicemail at the FLRSD Superintendent's office. The voicemail, which is difficult to follow, contains

demands for "AP and CP level work" and extensive profanity directed at ARHS teachers and administrators, including threats to get them fired. (S-10, S-14; Higgins III: 223-30; Lombard IV: 64-67; Starkie IV: 201-03) FLRSD administrators informed Chamberlain, Parent, and Gregory's therapist of the voicemail. When FLRSD administrators played the voicemail for Chamberlain staff, the latter viewed the message as "concerning," and "a reflection of . . . the thought processes and the scattered thinking [as Gregory] was kind of venting a lot of his frustrations." At the request of FLRSD, Gregory's therapist at Chamberlain performed a safety check and determined that Gregory was safe. (S-10, S-14; Vanderlip I: 123-24; Higgins III: 232; Lombard IV: 67-68; Starkie IV: 203-06)

55. On December 1, 2017, a mid-point status meeting was held at Chamberlain regarding Gregory. It lasted approximately four and a half hours. Parent; Ms. Harrington, Ms. Lombard, and Mr. Higgins from FLRSD; and Mr. Vanderlip, Mr. Edmond, and teacher Manny Alves from Chamberlain were present. Gregory participated briefly, and Ms. Cote participated by telephone for part of the meeting. Parent expressed dissatisfaction with Chamberlain, including a lack of communication from Dr. Kersting.[14] Chamberlain staff reported that Dr. Kersting, who is conservative in prescribing medication, nevertheless recommended that Gregory begin a trial of a medication. (S-10, S-43, S-55; Higgins III: 234-43; Vanderlip I: 97-99; Lombard IV: 55; Starkie IV: 207; Harrington IV: 325-26, 328-30, 151-52; Cote V: 40, 106; Parent VI: 133-38, 250, 260) It is not clear whether Parent was open to medication for Gregory at this time. Mr. Higgins' notes following the meeting indicate that Parent was, whereas Chamberlain's report indicates that he was not; at hearing father testified that he was on board with medication for Gregory at this time, but also that he did not trust Dr. Kersting to make a recommendation. (S-10, 43; Higgins III: 234-43; Vanderlip I: 131; Starkie 208-09; Parent VI: 258-61) Gregory was no longer receptive to the prospect of medication. (S-43; Higgins III: 239; Cote V: 43; Harrington V: 151-52) At this meeting, Parent emphasized Gregory's desire to return to ARHS. (Higgins III: 236-39; Harrington; S-10, 43) Ms. Cote supported this desire, explaining her belief that Gregory would be more regulated if he were permitted to return to ARHS and attend general education classes. (S-43; Cote V: 146-47 Vanderlip I: 149; Higgins III: 242)

56. Also at this meeting, Parent mentioned that he had submitted paperwork for Gregory to receive psychiatric services from a clinic in Plymouth, but that there might be a six to eight, or eight to ten, week delay before services would commence.[15] (Higgins III: 237; Harrington V: 153-54)

57. Later in December, Gregory gave a number of Chamberlain staff members Christmas cards containing inappropriate coupons or flyers for things like underwear. Although staff

---

[14] At hearing, Parent questioned whether Dr. Kersting existed, referring to him as "the alleged psychiatrist" (Father VI: 133-35) He later acknowledged that he had spoken twice with someone who identified himself as Dr. Kersting. Parent explained that at the time of the first telephone call, Dr. Kersting said that he was not comfortable prescribing any medication to Gregory, though when they spoke the second time Dr. Kersting recommended Abilify. (Father VI: 249-51, 254-55)

[15] At hearing, Parent testified that he stated at the October 20, 2017 meeting that he had placed Gregory on a list for services at a psychiatric clinic, with the recommendation of Dr. Vautrinot, but had been told subsequently by Ms. Cote that it appears the clinic had not called him back because "the Attorney General has got this action going against the facility and that I should not expect to receive any call any time soon." (Father VI: 246-47)

members did not view the gesture as sexual in nature, they did see it as displaying "a profound lack of understanding of social boundaries." (S-19; Vanderlip I: 119-20; Starkie IV: 213-14; Harrington V: 176-77)

58. At hearing Gregory reported feeling unsafe at Chamberlain due to "delusional depression" and "very disturbing kids." He stated the other students had bad behavior and anger issues, and he did not belong with them. (Student VI: 11, 83)

**2018: Discharge from Chamberlain, Initiation of Instant Proceedings, Return to Apponequet Regional High School, and Home Tutoring**

59.  A discharge meeting was held at Chamberlain on January 18, 2018. In attendance were Parent; Ms. Harrington, Ms. Lombard, and Dr. Starkie from FLRSD; and Mr. Vanderlip, Mr. Edmond, and Mr. Alves from Chamberlain. Ms. Cote participated by telephone for part of the meeting. (S-42; Lombard IV: 58) Chamberlain presented its findings, including a recommendation that Gregory attend a therapeutic day school with a therapeutically trained support staff, counseling and psychiatric services, a small structured classroom setting, clearly established goals and expectations, multi-modal instruction, and low teacher to student ratio. District staff did not receive Chamberlain's written Diagnostic Summary containing observational data, conclusions, and recommendations until the morning of the meeting, and Parent did not receive the written document until the meeting itself. Chamberlain's paperwork contained clerical errors regarding Gregory's grades. (S-19; Vanderlip I: 111, 128, 132-33, 160-62, 167; Father VI: 137, 253)

60. Chamberlain's Diagnostic Summary provides little helpful information regarding Gregory's academic abilities. For example, it states both that Gregory "displays gaps in math and struggles with some mathematical concepts such as exponents" and that he "displays the ability and eagerness to learn and a strong interest and strength in Math." Furthermore, the summary explains that Gregory "participates in class, takes notes, and displays the ability to complete class work and assigned tasks but his progress is at times inhibited due to his hyper focusing on returning to public school and taking AP classes," but includes nothing about the type or level of work he is doing. (S-19)

61. Chamberlain staff recommended that Gregory be placed in a therapeutic day setting because of his social-emotional and/or mental health needs, noting that his thought patterns and social-emotional difficulties hinder his ability to make progress. (S-19; Vanderlip I: 104, 106, 113-14, 132, 163; Starkie IV: 214-17) Mr. Vanderlip explained that Gregory had generally been successful at Chamberlain, but there were "ongoing concerns about some stability questions and some concerns about [his] thought sequences, and [how some of his behaviors] would be received in a more standard setting." (Vanderlip I: 171-72; Harrington V: 160)

62. FLRSD staff agreed with Chamberlain's recommendation. (Vanderlip I: 132-33; Lombard IV: 58) Parent was clearly distressed by it; he became animated, raised his voice, and hit his hand against the table. (Vanderlip I: 166; Starkie IV: 214; Harrington V: 162-63, 181-83; Father VI: 187-88) Ms. Cote, participating by telephone, expressed her belief that because

Gregory had done well at Chamberlain, he should not be punished by having to stay there. (Cote V: 44-45) The meeting ended when Parent rejected the results of the report and expressed his desire that Gregory return to ARHS. (Vanderlip I: 176, Lombard IV: 58; Harrington V: 181-83)

63. Gregory and his father believed that he was sent to Chamberlain as a punishment, and that if he completed an extended evaluation there, he would be able to return to ARHS. (Ghannam II: 182; Lombard IV: 58-59; Student VI: 49; Harrington V: 162-63; Father VI: 300) Ms. Cote questioned why the District would not place Gregory back at ARHS, since he had done everything he was supposed to do at Chamberlain. (Starkie IV: 218; Cote V: 40)

64. Immediately after the meeting on January 18, 2018, Ms. Harrington had Parent accompany her to her office, where she drafted a placement page for a therapeutic placement, which Parent rejected immediately. (S-2; Harrington V: 183-84;  Father VI: 185-86) Chamberlain subsequently offered to keep Gregory as an interim option until the BSEA process was resolved. (Vanderlip I: 135; Harrington V: 192)

65. Ms. Harrington then rushed to develop an IEP for the period from January 18, 2018 to January 17, 2019 for Gregory based on input from ARHS staff and discussions at Chamberlain. (S-1; DeTerra III: 67-71; Harrington V: 186-87, 193, 252-58) This IEP was sent to Parent by email on January 19, 2018 and shortly thereafter by regular mail, along with an offer to provide Gregory with tutoring until the parties could agree on an appropriate placement for Gregory pending the BSEA appeal the District planned to file. (S-51; Starkie: IV: 217; Harrington V: 192-93, 259) Parent rejected the option of tutoring provided by FLRSD. (Lombard IV: 70; Harrington V: 192)  The IEP drafted by Ms. Harrington contains little information regarding transition goals and services. (S-1; DeTerra III: 95; Harrington V: 228-29, 261-63; Father VI: 167-69)

66. No Team meeting has been convened with respect to this IEP.[16] (Father VI: 124, 163-64, 185)

67. Rather than explain to Parent that Gregory would return to ARHS as his stay-put placement until resolution was reached, FLRSD prevented Gregory from returning to school following his extended evaluation at Chamberlain because of a concern about his safety and that of his peers. (Harrington V: 194-95; Father VI: 157-58) Gregory was marked absent (unexcused) January 19, 22, 23, and 24, 2018, despite the fact that he was not permitted on school property. (S-35; Father VI: 157-58)

68. On January 22, 2018, the District filed its *Hearing Request* at the BSEA, accompanied by a *Request for Interim Relief from Stay-Put.* Although Parent rejected tutoring, he was not informed that Gregory had the right to return to ARHS despite his wish that Gregory do so immediately. (District's *Request for Interim Relief*; Starkie IV: 217; Harrington V: 194-95)

---

[16] Although the discharge meeting that occurred on January 18, 2018 might constructively be considered a Team meeting, given the attendees, it was not a formal Team meeting with notice of such, etc.

69. Following a Hearing Officer-initiated Conference Call on January 24, 2018, Gregory returned to school on January 25, 2018 pursuant to his stay-put IEP. (S-5, S-9; Starkie IV: 231) In the interim, Parent had brought Gregory to "Child and Family Services" for a crisis evaluation and gotten a letter to the effect that Gregory was safe to return to school and was not an immediate threat to himself or others. (Lombard IV: 144; Cote V: 46)

70. Upon his return to ARHS, Gregory was quiet and sullen in his transition meeting with Ms. Lombard. He expressed dissatisfaction with returning to the PLP and said he would refuse to attend classes. Concerned that Gregory was escalating in that his thoughts were becoming more scattered and he was becoming more agitated, Ms. Lombard contacted Parent, who came to school. Parent denied Gregory's request to leave and told him not to act like "a little bitch." (S-12; Lombard IV: 71-74; Starkie IV: 232-33; Father VI: 283)

71. During the approximately seven school days that he attended ARHS, Gregory appeared scattered, anxious, depressed, paranoid, dysregulated, and concerned about pleasing others. He seemed to "walk on eggshells." (DeTerra III: 27, 116; Lombard IV: 72-74, 77-78; Higgins III: 244, 246) Dr. Starkie assigned an additional paraprofessional to Gregory's classes "to help support [his] transition back to school," help him catch up, and support his teachers in working with him. (Starkie IV: 231-32) His special education teacher performed benchmark assessments at that time using the Fountas and Pinnell Benchmark Assessment System, since he had missed the administration of the test while he was at Chamberlain. His results revealed that his reading comprehension was at a mid-second grade level. Gregory was angry about having to do the testing, referring to it as "baby work" and "bullshit." He continued to carry around AP books, but was not observed dong anything other than flipping through them. He did not appear to be socializing with his peers. At one point he mentioned to Ms. DeTerra that he would not hurt anyone and he is not a danger. His teacher interpreted this remark as a disorganized request for approval, wherein Gregory wanted her to acknowledge that she didn't believe he would hurt anyone. (S-9; DeTerra III: 27-31, 35, 41-42; Lombard IV: 76; Starkie IV: 234)

72. While attending ARHS during this time, Gregory met with Ms. Lombard daily. At one meeting he gave her a packet of papers and a notebook that he described as extra work he had completed while at Chamberlain including "freshman, sophomore, junior, senior. . . physics, chemistry . . . CP and honors . . . extremely hard." Ms. Lombard gave Dr. Starkie the papers, which contain numerous references to Gregory's desire to be "normal," and to be placed in CP or AP classes; to people being "fired" or "banned" from the country; and to his resistance to medication. The writing, which Gregory referred to as a journal, is full of incomplete sentences and reflects disordered thinking. (S-13; Lombard IV: 79-80; Starkie IV: 228-30; Student VI: 73-74, 94)

73. Asked at hearing about his return to ARHS, Gregory stated that it "kind of sucked . . . they treated me like an outcast and humiliated me." (Student VI: 55)

74. At some point on or before February 5, 2018, Parent and the District reached an agreement for Gregory to be tutored at the Middleborough Library from February 5, 2018 through resolution of the BSEA matter. Gregory is being tutored ten (10) hours a week by a licensed

teacher, utilizing assignments provided by his ARHS teachers as coordinated by Ms. DeTerra (who also communicates with the tutor regarding strategies for working with Gregory), and receives counseling from Ms. Lombard once a week. (Ghannam II: 102-104, 193; DeTerra III: 49-51; Lombard IV: 28, 81; Starkie IV: 241-42) Tutoring is not going well, as Gregory is agitated, refuses to do work, uses profanity (sometimes directed at his tutor), and resists supports. (S-48, S-68, S-69, S-70, S-71; Ghannam II: 106-114; Higgins III: 246; Lombard IV: 82-84; Starkie IV: 290) Moreover to the extent he completes work, it is heavily supported but still does not meet expectations. (S-49; Motta II: 52; Ghannam II: 118-119, 144-47; DeTerra III: 52-54) He has become increasingly angry, depressed, noncompliant, and dysregulated. He talks about suicide and insults his tutor regularly. As such, after February vacation the District began sending a paraprofessional to Gregory's tutoring sessions and a second adjustment counselor to his meetings with Ms. Lombard. Neither the District nor Parent believes tutoring is an appropriate long-term option for Gregory. (S-46, S-47, S-68, S-69, S-70; Motta II: 52; Ghannam II: 115-18, 125-26; DeTerra III: 43-44, 47-8, 57; 128; Higgins III: 247; Starkie IV: 243-47; Harrington V: 196-99, 202-03 Cote V: 53; Parent VI: 283-84)

75. Nicole DeTerra, the certified special education teacher who co-teaches Gregory's PLP classes and teaches his academic support class, has seen Gregory in tutoring. She noted that he is still the same academically, but "as far as his emotional piece and his social piece, he's very withdrawn. He seems very sad and depressed, seems angry, seems frustrated, more so that he was in the fall." Gregory is so focused on the BSEA proceedings that he has even more difficulty accessing the curriculum. (DeTerra III: 63-65)

76. In contrast with reports of FLRSD, Gregory's therapist believes his behavior and depression have improved since December 2017, that he is using meditation and prayer effectively, and that college prep classes at ARHS are appropriate for him. Ms. Cote testified that since December Gregory has been less tangential, has accepted responsibility for his actions and his depression, and is focused on a positive future. (Cote V: 28-29, 52-53, 98, 114-16; Harrington V: 178-79, 294, 299)

77. At hearing, the clarity of Gregory's testimony was variable. He responded fairly clearly to his attorney's questions at first, though he frequently asked for questions to be repeated, asserted that he did not want to talk about personal things, and responded, "That's a tricky question." (Student VI generally) At some point, however, he began to digress and discuss irrelevant topics.[17] He focused on politics, including the wall, consistent with descriptions of

---

[17] For example, asked about his return to ARHS in early 2018, Gregory testified, "I know [classmate's] disorder because – now, if I was able to be the president of the school, I could do the Homecoming and say, like – like, they should do, like, a Saturday day, like the Homecoming in the daytime. Like, there's a lot of people – I mean, people have disorders of daytime or night. It's kind of complicated. I mean, I want people to be fair and equal. So that's someone who cares for someone." (Student VI: 56)

his presentations by Ms. Ghannam, Ms. Motta, and others.[18] Asked whether he watches a lot of news, Gregory explained:

"But you know you know I'm also good at visualizing and also reading laws. So you do know the next two years, I could be more intelligent than all of you. Not just me; there could be the next generation. And also, I created this thing, basically Diversity Day. . . So basically what it is, is on my birthday . . . it's like you can choose a job, basically a business. So rich, higher class, middle class, poor, you can choose any job, welding. So anything you want. You can even get paid on that day." (Student VI: 59)

When FLRSD's attorney asked him about "Striker Day," which he had mentioned to several District staff members, he explained:

"Basically, it's a diversity for everyone to choose anything they want. So those who are dangerous would have to be kicked out, because those who are safe would have to stay in there. So basically – so the problem is people don't want the communism. So as a politician, it's pretty stressful and strict. So those who are dangerous would have to be literally kicked out. So you have to kick them out so they don't do any dangerous things. So as a politician leader, I bet people would love me. Trust me, people love me. So I understand the pain of people who hated me. Yes, I actually have. But people who have hated you can also have love. So I have that." (Student VI: 59-60)

Gregory also stated, "So it looks like I'm going to be a new legend: Protest the government and a new civil right." (Student VI: 62) Asked whether he had difficulty accepting help, he responded:

"No, no. I like to do it – that's like adults – you don't seriously humiliate people, not even kids; because for the next generation, I'm going to help them, so this mess never happens again. I'm dead serious. So what I'm trying to say is – I know there are people who are crazy and people who are safe. There's a balance. But the problem is, I want to make society great again. Now, the problem is I have to make society – now, if you say people are all civilized, that's communism. Basically, that's communism. I mean, you have to balance." (Student VI: 76-77)

78. There is no indication that Gregory has begun receiving clinical or psychiatric services through the Plymouth clinic mentioned by Parent, nor is there any indication that he is receiving any kind of medication. (Lombard IV: 55; Starkie IV: 215; Cote V: 66-70; Harrington V: 154) Parent is highly concerned about the prospect of medicating Gregory, given the potential side effects of medication, and because of his lack of communication with Dr. Kersting, who recommended antipsychotic medication. (Father VI: 256-58)

---

[18] Asked for details about his desire to be a politician, Gregory responded, "Yes. I actually have a talent for that. So when there's a sticky situation – I mean, you can't always have a bad time. Sometimes I do, like, DJ music. Sometimes I read. I do different things to relax. But politics – so I would actually help the homeless. I know like Trump, he's a jerk. But in my opinion, he's going to waste a lot of money for the wall and basically, the inflation, and he's going to make the people decrease with our money, as wasting our time and money. I mean, I know, like, a lot of Republicans vote, but I don't think that's the best way in building a wall. But yes, it is also helpful for the drug lords. Basically, they don't come in. But there's a proof." (Student VI: 59)

**Responses to FLRSD's Proposal for a Therapeutic Day Placement**

79. FLRSD has investigated several potential placements for Gregory, including READS Collaborative, South Coast Collaborative, Pilgrim Area Collaborative, Southeastern Massachusetts Educational Collaborative, and Anchor Academy. (Harrington V: 207-08, 219) The District believes that a collaborative would be an appropriate placement for Gregory because of the flexibility this model entails, including the option to slowly step down through less restrictive programs. (Harrington V: 221-22, 300-01) The District has not sent out referral packets for Gregory because it does not have parental permission to do so, thought it has posed hypotheticals to administrators at potential placements in order to determine their suitability for him. (Harrington V: 212-14)

80. At this point, the District believes South Coast Collaborative's Gallishaw School may be a good option for Gregory because the program includes a doctor on staff that may provide psychopharmacological services, a nurse to monitor medication, and 1:1 and group counseling. Moreover, students at Gallishaw may be stepped down to a program housed in the Seekonk public high school, which would provide additional opportunities for inclusion. READS Academy may also be appropriate, according to the District, because it provides similar services and has a step-down substantially separate program located in a public high school. READS offers skilled counseling, trained therapeutic staff, a cohort of peers, and a board certified behavior analyst on staff; the program does not offer psychopharmacology services on campus but does coordinate with outside providers where appropriate and has a nurse available to monitor students. (Harrington V: 208-18) The District has indicated that it will send out packets to these programs if and when it obtains Parent's permission. (Harrington V: 218-20)

81. Dr. Dorn, the neuropsychologist who evaluated Gregory, believes that a therapeutic day program is appropriate for Gregory, as it would allow him to improve his behavior and social skills while receiving psychiatric care including medication. (Dorn I: 45-46)

82. Dan Vanderlip, an education supervisor at Chamberlain who worked with Gregory while he was there, believes that although Gregory may be academically capable of being educated in a public school, his social-emotional needs currently hinder his ability to succeed in that setting.[19] Instead, he requires therapeutically trained support staff prepared to intervene in crises and process with students when they are upset, in addition to academic supports. (Vanderlip I: 106, 113-14)

83. Gregory believes that he belongs in general education classes at a public school. At hearing he described his disability as a "memory disorder" that he has improved over the last four years because he "had an enlightenment. Basically, the philosophy of movement. It's a very

---

[19] This belief, that Gregory's social-emotional needs hinder his ability to perform academically, is consistent with that of Gregory's ongoing therapist, Danielle Cote, who testified that Gregory should be allowed to try out general education classes but admitted that at this point no one "knows what [Gregory] is capable of because of all of the mental health and stressors that he's under right now." (Cote V: 20) Similarly, FLRSD Director of Student Services Ellen Harrington testified, "I think that his mental health needs right now make it more difficult for him to demonstrate what his potential could be." (Harrington V: 302)

rare type of thing." (Student VI: 50, 87-88) Gregory does not believe he needs to be in a therapeutic setting or that he needs some of the supports that others believe he needs. (Vanderlip I:105; Motta II: 44; Ghannam II: 182-83; DeTerra III: 129; Lombard IV: 30; Starkie IV: 221; Cote V: 32-33; Student VI: 88-89)

84. Moreover Gregory does not believe PLP is the appropriate setting for him. At hearing he referred to the PLP as "communism," described his PLP classmates as "very disturbing" with "weird personality," and stated that he wants to be a "regular kid" so he can have freedom. (Student VI: 15-17)  He explained that being in the PLP caused him to be humiliated and treated like an outcast. (Student VI: 38) Instead, Gregory wants to be in general education classes "[b]ecause I'll be free. Something diverse. Not communism." (Student VI: 21)

85. Gregory's father supports his desire to be in general education classes at ARHS, and states that he is "cautiously not" concerned about Gregory, and states that he has heard about his son's mental health. He believes FLRSD wants to send Gregory to a therapeutic school primarily to increase the District's cumulative MCAS scores or because FLRSD is discriminating against Gregory. (Father VI: 290-91, 304-05)

86. Danielle Cote believes that Gregory is "a lot smarter than his verbal skills may let on" and that Gregory should be given the opportunity to attend general education classes, as this would improve his self-esteem and relieve his stress. According to Ms. Cote, "being in a setting where he can perceive himself as a normal kid would unlock his potential." (Cote V: 55; Lombard IV: 60; Cote V: 20, 28, 146) Ms. Cote, however, acknowledges that she is "not qualified to say what he needs academically." (Cote V: 81)

87. Gregory's teachers do not believe he would be successful in a general education classroom academically or behaviorally. In addition to his disorganization and difficulty completing assignments in accordance with instructions, he is not receptive to assistance; when he does something incorrectly, he does not want help because he believes he did it right. Gregory's teachers believe that he would not be able to succeed with the pacing and materials of unsupported general education courses and that "would be devastating for him." (DeTerra III: 58; Motta II: 44-45, 84-85; DeTerra III: 22-23; 123; Lombard IV: 30-32) Moreover Gregory's adjustment counselor Aimee Lombard believes Gregory requires far more intensive therapy than can be made available in a public school setting. (Lombard IV: 91) The District's Director of Student Services, Ellen Harrington, agrees. (Harrington V: 167)

88. The District recognizes that the IEP hastily prepared by Ms. Harrington and rejected by Parent is not sufficiently detailed. Ms. Harrington's intention is to reconvene the Team to amend the IEP with input from an out-of-district placement once it has been chosen. (Harrington V: 187-90)

## DISCUSSION

A.   Legal Standards: Free Appropriate Public Education, Least Restrictive Environment and Burden of Proof

22

The Individuals with Disabilities Education Act (IDEA) was enacted "to ensure that all children with disabilities have available to them a free appropriate public education" (FAPE).[20] FAPE includes both "specially designed instruction . . . to meet the unique needs of a child with a disability" and related support services "required to assist a child . . . to benefit from that instruction."[21] FAPE is delivered primarily through a child's individualized education program (IEP),[22] which must be tailored to address each student's unique needs that result from his or her disability.[23] As the United States Supreme Court held recently, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[24] Every IEP must "include a statement of the child's present levels of academic achievement and functional performance, describe how the child's disability affects the child's involvement and progress in the general education curriculum," and "set out measurable annual goals, including academic and functional goals, along with a description of how the child's progress toward meeting those goals will be gauged."[25]

Under state and federal special education law, a school district has an obligation to provide the services that comprise FAPE in the "least restrictive environment."[26] This means that to the maximum extent appropriate, a student must be educated with other students who do not have disabilities, and that "removal . . . from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services, cannot be achieved satisfactorily."[27] "The goal, then, is to find the least restrictive educational environment that will accommodate the child's legitimate needs."[28]

FAPE is defined by the IDEA to include state educational standards, which may exceed the federal floor.[29] Massachusetts FAPE standards seek "to ensure that eligible Massachusetts students receive special educational services designed to develop the student's individual educational potential in the least restrictive environment.[30] Moreover a student's IEP must be designed to enable the student to make "effective progress."[31]

---

[20] 20 U.S.C. § 1400(d)(1)(A).

[21] *Endrew F. v. Douglas Cnty. Sch. Dist.*, 137 S.Ct. 988, 994 (2017) (citing 20 U.S.C. § 1401(9), (26), (29)) (internal quotation marks omitted).

[22] *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).

[23] See *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982) (FAPE must be "tailored to the unique needs of the handicapped child").

[24] *Endrew F*, 137 S.Ct. at 1001; see *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 84, 84 (1st Cir. 2012) (IEP must be reasonably calculated to confer meaningful educational benefit).

[25] *Endrew F.*, 137 S.Ct. at 994 (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III) (internal quotation marks omitted).

[26] 20 USC § 1412(a)(5)(A); 34 CFR 300.114(a)(2)(i); MGL c 71 B, §§ 2, 3; 603 CMR 28.06(2)(c).

[27] 20 USC 1412(a)(5)(A).

[28] *C.G. ex rel. A.S. v. Five Town Comty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008).

[29] 20 USC 1401(9)(b); see *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524-25 (2007); see also *Mr. I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 11 (1st Cir. 2007)(state may "calibrate its own educational standards, provided it does not set them below the minimum level prescribed by the [IDEA]").

[30] 603 CMR 28.01(3); see MGL c. 69, § 1; MGL c. 71B, § 1.

[31] 603 CMR 28.05(4)(b) (IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum").

As the Supreme Court, lower federal courts and Massachusetts special education statutes have recognized, the application of the meaningful benefit standard is individualized. "[L]evels of progress must be judged with respect to the potential of the particular child,"[32] unless the potential is unknowable,[33] because "benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between."[34] The sufficiency of any student's progress, including Gregory's, must be judged within the context of his individual potential or capacity to learn.[35]

As the party challenging the status quo in this matter, the District bears the burden of proof.[36] As such, to prevail, the District must prove, by a preponderance of the evidence, that the IEP it proposed for the period from January 18, 2018 to January 17, 2019, including placement at a therapeutic day school, is reasonably calculated to provide Gregory with a FAPE in the least restrictive environment.

B.     A Therapeutic Day Program Is the Least Restrictive Environment In Which Freetown-Lakeville Regional School District Can Reasonably Provide Gregory With a FAPE.

It is not disputed that Gregory is a student with a disability under federal and state special education law. The issue is whether the IEP proposed by FLRSD is reasonably calculated to enable Gregory to make progress appropriate in light of his unique circumstances.[37] To make this determination, I must be mindful of the unique needs that result from Gregory's disability.[38] As the crux of the dispute between the parties involves the setting in which Gregory is to be educated, I begin with an examination of the proposed placement.

FLRSD has proposed a therapeutic day program for Gregory. As Parent refuses consent, the District has not sent any referral packets for Gregory, but FLRSD Director of Student Services Ellen Harrington has researched and visited several potential placements. Those under serious consideration have some essential features in common: psychopharmacological services (including a prescribing psychiatrist and medication monitoring) on campus, or closely coordinated with outside providers; the option to step-down slowly through less restrictive programs, up to and including programs sited at public high schools; and on-site counseling. Dr. Dorn and Dr. Vautrinaut, both experienced psychologists who evaluated Gregory in the fall of 2017, recommend a therapeutic day program for him, as does Dan Vanderlip, an education supervisor who is familiar with the therapeutic milieu and who interacted regularly with Gregory during his time at Chamberlain. The only individuals who disagree with this proposal are Gregory, his father, and Gregory's therapist Danielle Cote.

---

[32] *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008) (*Lessard I*); see *Esposito*, 675 F.3d at 36 ("In most cases, an assessment of a child's potential will be a useful tool for evaluating the adequacy of his or her IEP").

[33] See *Esposito*, 675 F.3d at 36.

[34] *Rowley*, 458 U.S. at 202.

[35] See *Rowley*, 468 U.S. at 202; 603 CMR 28.01(3); see also *Endrew F.*, 137 S.Ct. at 999 ("That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise.")

[36] See *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2008).

[37] See *Endrew F*, 137 S.Ct. at 1001.

[38] See *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982) (FAPE must be "tailored to the unique needs of the handicapped child").

Gregory feels humiliated by his placement in the PLP and believes he is capable of CP or honors level work; he sees no need for a therapeutic placement. Gregory's father also believes he is capable of, and has completed, high level academic work, and he supports his son's desire to be "normal." Evidence at hearing, however, did not support Gregory and his father's understanding of Gregory's academic abilities. Although Gregory's therapist has met with him consistently for almost three years, her description of his presentation and abilities was contradicted by no fewer than eight individuals who have also worked directly with him. Ms. Cote testified about Gregory's social skills and functioning with peers, though she has never seen him in those contexts. Furthermore, her recommendation that he be allowed to try general education programming is based primarily on her concerns about his self-esteem, as she acknowledged that she is not qualified to evaluate academic programming. As such, I find Ms. Cote unpersuasive with respect to Gregory's academic and therapeutic needs or his functioning outside of their private therapy sessions.

The programs recommended by FLRSD are all substantially more restrictive than Gregory's current placement in the partial inclusion PLP program and even more so, compared with his preferred placement in general education classes. Bearing in mind the law's mandate that an IEP call for the least restrictive environment that will accommodate Gregory's legitimate needs, I examine Gregory's past performance in various settings. The teachers that have worked with Gregory during his time in the PLP at ARHS testified in detail about his presentation and performance over the last two years. They explained his difficulty following instructions, remaining focused, asking for help, and even expressing coherent thoughts at times. Nicole DeTerra, Jessica Motta, and Stephanie Ghannam all presented as experienced educators who care deeply about Gregory, and who have struggled to help him learn. Adjustment counselor Aimee Lombard's concern about Gregory's increasing dysregulation, and the inability of ARHS to provide the therapeutic supports he requires, is founded on her extensive experience with him. Gregory's work samples, submitted by FLRSD, and his testimony at hearing, provide further support for FLRSD's assertion that neither PLP nor general education courses will provide a FAPE for Gregory as he currently functions.

Although the Diagnostic Summary developed by Chamberlain provides little information regarding Gregory's academic abilities, the testimony of Education Supervisor Dan Vanderlip demonstrates that Gregory is able to function in a therapeutic day setting. Gregory continued to require supports to stay focused and engaged, but he participated in class and followed staff direction. Moreover he was respectful toward staff and peers and generally followed classroom rules and expectations, in contrast to his presentation at ARHS and in tutoring.

For these reasons, I conclude that FLRSD has met its burden to prove that a therapeutic day program with the features described above, including opportunities for inclusion as appropriate, is the least restrictive setting in which it will be able to provide Gregory with a FAPE.

C.      Freetown-Lakeville's Proposed 2018-2019 IEP Must Be Modified In Order to
        Provide Gregory with a FAPE.

As Ms. Harrington acknowledged, the IEP proposed by FLRSD and entered into evidence at the hearing was hastily prepared by her as the District prepared for hearing. Ms. Harrington consulted with FLRSD staff in the course of developing the IEP, but no Team meeting was held to discuss it. Although FLRSD had a basis to believe Parent would not agree to placement of Gregory in a therapeutic day program, as it was proposing, this does not relieve the District of its obligation to comply with procedural requirements for developing an IEP.[39]

In addition to this procedural shortcoming, substantively the IEP is lacking. For example, despite testing that shows Gregory's reading comprehension to be at the mid-elementary school level, his IEP refers to grade-level texts. The goals and benchmarks do not specify where Gregory is functioning academically. Moreover, as emphasized by Parent, through his attorney, scant attention has been paid to transition goals and services. Although several witnesses testified about the difficulty of assessing Gregory's academic functioning because of his psychiatric instability, even with the limited information the District has from its assessments it should have provided a more fully developed IEP. Generally an IEP drives placement and not the other way around. This case is in an unusual posture, however. Although the proposed placement is clearly appropriate, the goals, benchmarks, and accommodations are too vague.

For these reasons, I conclude that FLRSD has not met its burden to prove that the non-placement portions of its proposed IEP are reasonably calculated to provide Gregory with a FAPE. The District is hereby directed to convene a Team meeting for the purposes of modifying its proposed IEP, ideally in collaboration with the therapeutic day program the Team selects for Gregory, that reflects the most accurate assessments of his current needs.

D.    A Cautionary Note Regarding Due Process

Clearly Gregory was struggling through the fall of 2017 and FLRSD administrators were concerned about his escalating behavior, particularly in light of the tragedies occurring in schools nationwide. It appears, however, that this concern at times trumped due process; Gregory was not permitted to return to school following his five-day suspension in October 2017, both before the meeting that took place on October 20, 2017 and after that meeting until he was able to begin his extended evaluation at Chamberlain. Whether Parent agreed to this and/or understood that he had any other choice is unclear, but in any event there does not appear to be anything in writing to document that Gregory's absence from ARHS was voluntary.[40] Following his discharge from Chamberlain on January 18, 2018, he was once again prevented from returning to ARHS, this time on the basis of escalating behavior that had occurred months earlier and a voicemail he had left in November. In sum, Gregory was excluded from school, without

---

[39] These include, but are not limited to, prior written notice and attendance at a Team meeting to develop an IEP, which includes all required components, by all Team members whose attendance is not excused in writing. (See, e.g., 20 U.S.C. § 1414(d)(1)(A), (B), and (C).

[40] In *Quin v. Framingham Public Schools,* BSEA #1605247 (Reichbach 2016), the undersigned hearing officer set forth the due process required for a change of placement outside of the Team process, including an "agreement otherwise" for home tutoring. In the instant matter, it does not appear that a change in placement had occurred as of the date Gregory returned to school, as his cumulative suspensions had not yet reached ten (10); absent the BSEA's intervention, however, a change of placement would have occurred on the date Gregory returned to school.

evidence of due process, for approximately nine (9) days during the 2017-2018 school year.[41] Because Parent did not file any counterclaims, despite being represented and being advised of this possibility, I cannot make findings on these issues given the constraints of the IDEA's requirements for notice of claims and the opportunity to respond and attempt resolution prior to litigation.[42] But the record suggestions that school administrators' apprehensions about school safety in this case may have infringed on Gregory's due process rights.

## CONCLUSION

For the reasons above, I find that the Freetown-Lakeville Regional School District has met its burden to prove that a therapeutic day program, ideally a collaborative that offers opportunities for inclusion, is the appropriate placement for Gregory. The District has not, however, met its burden to prove that the goals, benchmarks, services, and accommodations contained within the proposed 2018-2019 IEP are reasonably calculated to provide Gregory with a FAPE.

## ORDER

Freetown-Lakeville Regional School District is hereby ordered to convene a Team meeting within fourteen (14) days of Gregory's acceptance into a placement in order to modify its proposed IEP, consistent with this Decision.


By the Hearing Officer:


_____

Amy M. Reichbach
Dated: May 18, 2018

---

[41] See *id*. (outlining best practices to be followed).
[42] See generally 20 U.S.C. § 1415 (f) and regulations promulgated thereunder.